**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
**LOUIS HOLMES,**

                             Plaintiff,                 **Case No. 23 Civ. 2123**

       -v-                             **COMPLAINT**

**THE CITY OF NEW YORK,**

                             Defendant.
--------------------------------------------------------------------x

Plaintiff Louis Holmes hereby charges the above-named defendant, the City of New York, with unlawful and discriminatory employment practices based on race and retaliation as follows:

## PRELIMINARY STATEMENT

1.      The New York Fire Department's ("FDNY") Engine Company 10 and Ladder Company 10, known as Ten House, is the closest firehouse to the World Trade Center site in downtown Manhattan, and is perhaps the Department's most renowned firehouse. Ten House stood despite suffering significant damage and being nearly destroyed on September 11, 2001. Ten House's heroic firefighters were some of the first responders to respond to the attack. Tragically, five courageous members of the Ten House made the supreme sacrifice that day.

2.      Many tons of building debris fell onto Ten House on 9/11, blowing out windows and doors and causing extensive structural damage.  The debris from the collapse was up to six feet deep in some parts of the station.

3.      During the rescue and recovery operations and subsequent clean up of the 9/11 site, Ten House was used as a rest and recuperation station as well as a command post for fire department operations at the site.

4.      Ten House eventually reopened as a fire station in November 2003 after a multi-million-dollar repair and renovation.

5.      Plaintiff Louis Holmes was only a high school student on 9/11 yet was inspired by the bravery of and sacrifices made by so many Americans that day – Americans from all races, colors, religions, and walks of life.  Mr. Holmes knew right then that he wanted to devote his life to public service.

6.      After graduating from college, Mr. Holmes followed through on his promise and joined the United States Coast Guard at the height of Operation Iraqi Freedom.  After being honorably discharged, in 2015, Mr. Holmes joined the FDNY as a firefighter.

7.      Firefighter Holmes currently has the privilege of working in the heroic Ten House.

8.      Unfortunately, while the memory of those heroes from Ten House who made the ultimate sacrifice on 9/11 will never be forgotten, many of Ten House's present-day firefighters have shamefully subjected Mr. Holmes, one of the station's only Black firefighters, to a work environment reminiscent of the Jim Crow era where it is acceptable to systematically treat Black people like second class citizens and relentlessly subject them to vile, abhorrent acts of racism.

9.      Firefighters take an oath to serve the public.  Plainly, anti-Black rhetoric and the promotion of racism and divisiveness in the workplace, like what has unfortunately inundated Ten House throughout Mr. Holmes's employment, squarely conflicts with the interests of the communities the FDNY is supposed to serve.

10.      As discussed more fully below, during Mr. Holmes's employment with the FDNY, he has experienced a hostile work environment created by his white counterparts through derogatory statements about, among other things, Black Lives Matter protests and protestors, and

comments supporting police violence against Black persons.  In fact, in September 2020, after months of racially charged conversations and offensive commentary at Ten House, several white firefighters, who knew full well about the heightened racial tension in the air, prominently posted a "Firefighters for Trump" t-shirt order form in the station, in violation of FDNY regulations banning political attire in the workplace.  However, even though 11 firefighters signed up to order a "Firefighters for Trump" t-shirt in violation of the FDNY's rules, not a single firefighter was disciplined.

11.    Perhaps more troubling, when Mr. Holmes complained about this racially hostile conduct, his overtime hours were significantly cut, and he was assigned to work alongside the very white firefighters against whom he complained.  The FDNY also subjected Mr. Holmes to disparate treatment based on his race by suspending him for an unfortunate arrest involving a familial dispute but failed to take these same disciplinary measures against white firefighters that were also arrested, often for far more serious alleged crimes.

12.    As detailed below, the FDNY: (i) suspended Mr. Holmes without pay for 28 days after he was arrested, a more severe punishment than his white counterparts; (2) forced him to work in racially-divisive environment where white firefighters routinely made disgusting anti-Black comments in front of and towards Mr. Holmes; (3) created a hostile work environment by allowing firefighters to watch contentious news programs while on duty, discuss and make incendiary remarks about political issues involving race in the workplace, and otherwise incite anti-Black commentary; (4) did virtually nothing beyond removing the flyer when white firefighters violated FDNY regulations forbidding members from political campaigning by derisively posting a "Firefighters for Trump" t-shirt sign-up sheet at Ten House; (5) failed to address any of these racially-charged incidents in any sort of meaningful way, and only

addressed them briefly and in a dismissive manner; (6) retaliated against Mr. Holmes after he
filed a complaint of discrimination by denying him overtime opportunities; (7) forced Mr.
Holmes to work with a white firefighter immediately after Mr. Holmes specifically reported that
person for his racially charged comments; and (8) fostered a racially hostile and corrosive work
environment in which white firefighters felt comfortable enough and were emboldened to place ***a
rat*** figurine in front of a picture of Mr. Holmes in his uniform hung up in Ten House because he
reported racial discrimination in the workplace.

13.     Pictures depicting the rat figurine placed in front of Mr. Holmes's picture are
embedded below:







14.     The FDNY failed to prevent the creation of a racially charged and hostile work environment in Ten House, has discriminated against Mr. Holmes based on his race, and has unlawfully retaliated against Mr. Holmes.  The FDNY treated Mr. Holmes differently as compared to similarly-situated employees who were not Black and did not complain about discrimination with respect to the terms and conditions of their employment.  These acts of discrimination and retaliation substantially interfered with Mr. Holmes's employment.

15.     As a result, Mr. Holmes brings this action to seek redress for the unlawful employment practices committed against him, including the FDNY's discriminatory treatment towards him due to his race, as well as unlawful retaliation due to his complaints of racial discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("NYCHRL").

## ADMINISTRATIVE REQUIREMENTS

16.     On or about December 22, 2020, Plaintiff filed a Charge of Discrimination against Defendant with the New York State Division of Human Rights ("NYSDHR") which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") concerning the allegations of racial discrimination and retaliation set forth in this Complaint.

17.     Prior to the filing of this action, the NYSDHR released jurisdiction over Plaintiff's Charge of Discrimination, while Plaintiff has requested that the EEOC issue Plaintiff a Notice of Right to Sue letter in connection with his Charge of Discrimination so that he can bring all his claims, including his claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), in this suit.

18.     When the EEOC issued Plaintiff a Notice of Right to Sue, he will respectfully seek leave to amend this Complaint to include his claims under Title VII.

19.     All other known administrative requirements have been met.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Mr. Holmes's rights under Section

1981.  The Court has supplemental jurisdiction over Mr. Holmes's related claims arising under New York state and city law pursuant to 28 U.S.C. § 1367(a).

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

22.    Plaintiff Louis Holmes is an FDNY firefighter who resides in Brooklyn, New York.  At all relevant times, Mr. Holmes qualified as an "employee" under all relevant statutes.

23.    The City of New York is a municipal corporation of the State of New York.  At all relevant times, the City of New York controlled the terms and conditions of Plaintiff's employment and qualified as an "employer" and "employed" Mr. Holmes under all relevant statutes.

24.    The FDNY is a department of the government of the City of New York City that provides fire protection services, technical rescue/special operations services, chemical, biological, radiological, nuclear, and high-yield explosive/hazardous materials response services and emergency medical response services within the five boroughs.  The FDNY is the largest fire department in America.  As of 2021, however, 75% of FDNY firefighters are white, and only 8.2% are Black, with 13.4% Hispanic and 2% Asian.  In comparison, the New York City Police Department ("NYPD") reported that 47% of its police force is white.

25.    Until 2019, the FDNY issued training materials to firefighters that included a memo abhorrently stating that: "Motivation in firefighting is largely a matter of team building … Team building encounters ***special problems*** when the team has to readjust to new members,

*minorities or females*, or members who are problems because they do not behave." (emphasis

added).[1]

## FACTUAL ALLEGATIONS

26.     Louis Holmes is a 38-year-old Black man who was born and raised in New York

City.

27.     Mr. Holmes is a veteran of the U.S. armed forces, having been a member of the

U.S. Coast Guard during Operation Iraqi Freedom from 2007-2010.

28.     In 2015, Mr. Holmes applied to be a firefighter with the FDNY.  After he

completed the FDNY academy, the FDNY appointed Mr. Holmes to the position of firefighter in

May 2016.

29.     Throughout the duration of his employment, Mr. Holmes has performed his duties

in an exemplary manner.  Nevertheless, the FDNY has subjected Mr. Holmes to disparate

treatment based on his race and has retaliated against Mr. Holmes for his engagement in

protected activity when he complained of discrimination.

## I.     Mr. Holmes is Subjected to Racially Disparate Treatment by the FDNY

30.     Almost immediately after his hire, Mr. Holmes recognized that the FDNY

promoted an extremely racist culture.

31.     For example, in 2017, former FDNY Commissioner Salvatore Cassano's son,

Joseph, allegedly placed a noose in the locker of a Black firefighter.  He also posted racist

comments on social media about Black people and how he did not care for Martin Luther King,

Jr. but was appreciative of receiving holiday overtime pay.  Upon information and belief, after

---

[1]      https://www.insider.com/fdny-training-manual-said-women-and-minorities-hamper-team-building-2021-10

temporarily leaving the FDNY, Joseph Cassano was rehired by the FDNY in 2018, with what is believed to be a better and higher paying position.

32.    On March 11, 2020, Mr. Holmes was unfortunately arrested due to a familial incident.  The charges against him were ultimately dropped a few months later.

33.    However, on March 13, 2020, the FDNY suspended Mr. Holmes's employment without pay for 28 days – the maximum number of days it could suspend a firefighter in such circumstances.

34.    The FDNY's decision to suspend Mr. Holmes was motivated by racial animus. Mr. Holmes, and other Black FDNY firefighters, have been disparately treated with respect to the terms and conditions of their employment than non-Black firefighters.

35.    According to FDNY regulations, "The Chief of Department, assistant and deputy assistant chiefs, or the Bureau of Investigation and Trials, may recommend to the Fire Commissioner suspension from duty of any member for flagrant violations of regulations, in cases causing the reputation or discipline of the Department to suffer, or when the member may be a danger to themselves or others."  FDNY Regulations, Chapter 26, Section 7: Suspensions.

36.    The regulations do not specify that the charges themselves have any impact as to whether the firefighter will be suspended.

37.    Even though the FDNY claims it maintains a policy of automatically suspending personnel after they are arrested to investigate the situation, the department applied this alleged policy in a racially disparate manner by suspending Mr. Holmes but failing to suspend white firefighters who too had been arrested.

38.     The charges against Mr. Holmes were not "worse" or more harmful to the FDNY than those criminal charges against numerous white firefighters who were not immediately suspended after their arrest or were otherwise disciplined far less severely.

39.     This included a white firefighter, identified herein as "FS," who was arrested for domestic violence and terrorism in 2018 and not suspended from work.

40.     Likewise, two white FDNY firefighters who will be identified herein as "MPa" and "MF," were both, upon information and belief, arrested in New Jersey in 2020 for interfering with a police investigation/disorderly conduct but were not suspended.

41.     Unlike Mr. Holmes's arrest, MPa and MF's arrests were reported by the media, bringing disrepute to the FDNY.

42.     Mr. Holmes was also punished more quickly and severely than white firefighters who had also gotten arrested.  For instance, a white firefighter identified herein as "JN" was arrested in November 2020 and charged with drunk driving resulting in another person;s death but not suspended until March 2021.  Likewise, a white firefighter identified herein as "JM" was only suspended for 14 days following his arrest.

43.     Other white firefighters who were arrested but not suspended and/or disciplined as harshly or swiftly as Mr. Holmes include and are identified herein as: "AT," "FM," "MPr," JE," "VM," and "AD."

44.     In contrast, Mr. Holmes was removed from his workplace and was without a paycheck for nearly a month based on discriminatory animus towards his race causing him financial and emotional harm.

45.     Moreover, upon information and belief, due to his unlawful and discriminatory suspension, Mr. Holmes was materially harmed when the FDNY denied him the opportunity to

join its Counter Terrorism Response Team after he applied in February 2020. Mr. Holmes was arguably over-qualified for this team, given his experience as a former member of the U.S. Coast Guard, experience working for the federal government, and experience as an Emergency Medical Technician/Emergency Cardiac Care, which happened to be the only listed requirement for the role. The reason why Mr. Holmes was not chosen was clearly because of his suspension. If Mr. Holmes had joined the Counter Terrorist Response Team, he would have earned hundreds of thousands of dollars in additional overtime.

46.    Notably, in or about 2004, a Black firefighter identified herein as "RS" was fired for testing positive for having taken steroids. However, even though Mr. Holmes has credibly reported three white firefighters to the FDNY Bureau of Investigations and Trials ("BITS") for using steroids and other dangerous drugs, the FDNY has done nothing to address or discipline these white firefighters.

47.    After the conclusion of Mr. Holmes's 28-day suspension, he was ordered to seek counseling. Eventually, the criminal charges against Mr. Holmes were fully dismissed in September 2020, and the FDNY paid Mr. Holmes his back wages for the period of his suspension.

## II.    Mr. Holmes is Subjected to a Hostile Work Environment at Ten House Rife with Relentless Anti-Black Rhetoric and Racism

48.    In the summer of 2020, protests broke out all throughout the United States after a series of publicized incidents in which police officers murdered or shot unarmed Black people. The protests called for greater racial equality and an end to systemic race discrimination.

49.    Unfortunately, throughout this time, many white FDNY firefighters openly espoused bigoted opinions in the workplace about, among other things, why police shootings of unarmed persons and other acts of police brutality were justified. Many white FDNY firefighters

also expressed disrespect and/or resentment towards Black firefighters as a proxy for their apparent frustrations against the Black Lives Matter protests occurring at the time. Many white FDNY firefighters routinely expressed anger and frustration towards Black people for protesting for equal rights, which prompted division among members along racial lines.

50.     Even though the protestors were overwhelmingly peaceful and respectful to firefighters and law enforcement, many white FDNY members would immediately display resentment and hostility if they became aware of the presence of protestors, and would make disgusting comments such as, "get the hose ready."

51.     Moreover, spurred on by incendiary and politically divisive commentary and news segments championed on Fox News, many white firefighters in Ten House routinely made anti-Black comments in Mr. Holmes's presence that any Black person would find offensive.

52.     For instance, in lockstep with the pattern of constant harassment and ostracizing of Mr. Holmes by white Ten House firefighters that had emerged, on July 8, 2020, a white firefighter identified herein as "TD" deliberately tried to make Mr. Holmes — one of the few and arguably most outspoken of the Black firefighters in Ten House — feel uncomfortable and unwelcome by making hurtful racist remarks in connection with the tragic death of George Floyd.

53.     White firefighter TD loudly remarked that George Floyd was a "piece of shit" and that the NYPD should start murdering Black Lives Matter protesters.

54.     Firefighter TD went on to remark that "white privilege" did not exist, railing against the notion that systemic racial inequality may be real, and attempted to downplay and minimize the prevalence of police brutality against Black people in America.

55.     At other times, Firefighter TD openly spoke out in support of and/or defended racist comments/policies of President Trump.  Firefighter TD even spoke in favor of George Zimmerman who murdered an unarmed Black child named Trayvon Martin.

56.     In other instances, Firefighter TD declared, "all terrorists are Muslims," knowing full well that Mr. Holmes was both a veteran of the U.S. armed forces and raised as a Muslim. This was in line with the Islamophobia expressed by other white firefighters in Ten House, some of whom who have even refused to call a fellow Muslim firefighter by his real, Islamic-inspired name, and call him by a nickname instead.

57.     A white firefighter identified as "JMc" also remarked openly about how he believed that an NYPD officer who had recently put a Black man in a chokehold was justified in doing so.

58.     Simply and sadly, the FDNY engendered a bigoted work environment in which all too many FDNY firefighters became radicalized and embraced extremist rhetoric commonly promoted by white supremacist groups.

III.    **Mr. Holmes Repeatedly Engages in Protected Activity by Objecting to the Racist Work Environment at Ten House and is Subjected to a Campaign of Insidious Retaliation From the FDNY**

59.     Later that day, Mr. Holmes complained to Captain Frank Stonitsch about the racially hostile and harassing work environment to which he was being subjected.  Capt. Stonitsch, however, dismissed Mr. Holmes's complaints and failed to properly escalate or remedy the situation.  Instead, he allowed the white officers to return to acting in a hostile and racially harassing manner towards Mr. Holmes in short order, after ordering the whole crew to complete extra drills to conceivably preoccupy Mr. Holmes and deter him from lodging further complaints.

60.    Seeing as how his supervisors were not taking his discrimination complaints seriously or meting out discipline to the racist firefighters he identified, during roll call that day, and in front of the entire Ten House crew, Mr. Holmes confronted Firefighter TD and expressed how he objected to hearing his racist, degrading, and inappropriate commentary, and asked to work in an environment free of racial hostility.  Firefighter TD became engaged, yelling back at Mr. Holmes, before storming off.  Firefighter TD did not deny making the comments in question but claimed he was merely "joking."

61.    Two other white firefighters whom Mr. Holmes identified as contributing to the racially hostile work environment apologized to Mr. Holmes, confirming Mr. Holmes's account of their and Firefighter TD's hurtful, racist behavior.

62.    Despite his complaints, Mr. Holmes has had to continue to work with Firefighter TD through the present.

63.    Then, on September 11, 2020, white firefighters in Ten House posted a sign-up sheet for those interested in wearing a t-shirt with the words, "Firefighters for Trump" on it. This incident took place after months of racially charged conversations between firefighters, and after Mr. Holmes spent virtually the entire summer of 2020 listening to other firefighters disparage protestors, speak out against the Black Lives Matter movement, support police violence, and generally indorse a pattern of vile, anti-Black rhetoric.

64.    Mr. Holmes felt threatened by these conversations as a Black man surrounded by white members who vigorously take issue with Blacks and how they choose to advocate for their rights.

65.    That white firefighters could be so emboldened and willing to defy FDNY regulations banning political attire in the workplace just to offend and ostracize firefighters of

color who did not subscribe to President Trump's racially divisive and cruel messaging speaks

volumes of the corrosive, openly racially hostile work environment at Ten House.

66.     Notably, despite FDNY's policy prohibiting employees from wearing political

attire, FDNY Commissioner Daniel Nigro, First Deputy Commissioner Laura Kavanagh, and

Chief John Sudnik were all present at Ten House celebrating the anniversary of 9/11 and clearly

saw the flyer posted for the "Firefighters for Trump" t-shirt but did absolutely nothing to address

the situation appropriately.

67.     Eventually, after Mr. Holmes complained, the flyer was taken down, but no

discipline was issued to any of the white firefighters involved in the stunt.

68.     Remarkably, in at least one other FDNY firehouse, a white firefighter repeatedly

came into work wearing a "Firefighters for Trump" t-shirt.  This was reported to Mr. Holmes by

a Black firefighter from that station, demonstrating that the racially hostile and harassing work

environment that Mr. Holmes faced at Ten House was endemic within the FDNY.

69.     On September 23, 2020, Mr. Holmes met with Michelle Lau, an attorney in the

FDNY's Equal Employment Opportunity office ("EEO") to complain about the race

discrimination and harassment he was experiencing in the workplace.

70.     On October 9, 2020, Mr. Holmes filed a written complaint with EEO concerning

the discriminatory and retaliatory behavior of the above-identified Ten House firefighters, as

well as to report Captain Stonitsch's failure to address or rectify his earlier complaints.

71.     In his written complaint, Mr. Holmes cautioned the FDNY about the hostile,

politically charged work environment that had engulfed the Department, and which could easily

lead to violence amongst members given the growing tensions and division regarding incidents

in the news and the community.  He also advised the FDNY that there were other Black

firefighters who too were deeply troubled by the hostility and racism they were experiencing in their workplaces but were afraid to speak out and/or believed they would be violating unwritten FDNY code by complaining against fellow firefighters despite the emotional toll and negative mental health ramifications caused by enduring such hurtful, racist conduct daily.

72.    The FDNY not only disregarded Mr. Holmes's warnings but embarked on a campaign of retaliation meant to punish Mr. Holmes for speaking out against racism in the FDNY.  This was, unfortunately, hardly surprising given FDNY's culture of shunning people who come forward to report bad behavior, who are quickly regarded as "rats" and "outcasts" in the Department.

73.    For instance, on November 9, 2020, in retaliation for Mr. Holmes' discrimination complaints, a white Firefighter identified as "VF" attempted to harass and trigger Mr. Holmes while the two were in the firehouse kitchen by stating, "Kamala Harris is not black." He also made offensive remarks defending a white couple in Missouri who had waved their guns at Black protestors near their home.

74.    These comments were emblematic of the racist culture promoted throughout the FDNY's ranks.

75.    Then, on November 10, 2020, Mr. Holmes was assigned to partner with Firefighter TD against whom Mr. Holmes had lodged multiple complaints of race discrimination, and who continued to act in a hostile manner towards Mr. Holmes by ignoring and avoiding him entirely.

76.    In hindsight, Firefighter TD was behaving just as how Academy Drill Instructors cautioned firefighters during training, and as later reinforced throughout an FDNY firefighter's employment like mantra: If FDNY members ridicule you, they like you, but if they do not speak

to you or give you the silent treatment, they do not like you, and if you file an EEO complaint, you will receive the silent treatment and be labeled as the EEO guy to whom no one speaks.

77.     Furthermore, on November 20, 2020, as more retaliation for engaging in protected activity, the FDNY inexplicably denied Mr. Holmes the opportunity to work overtime.  In fact, Mr. Holmes's name which had been written in the overtime "manpower" book since Monday November 16, 2020, as working overtime on November 20, 2020, was blatantly crossed out and replaced with white firefighter FS's name.  No explanation was ever given to Mr. Holmes for why the FDNY decided to suddenly cancel this overtime opportunity.

78.     Typically, firefighters who had the least amount of overtime hours worked would be selected to work overtime, and at this time, Firefighter FS had worked 222 overtime hours compared to Mr. Holmes's 148 overtime hours.

79.     Mr. Holmes complained to an assistant to the Fire Chief named Chris Borden about being retaliatorily denied the opportunity to work overtime because of his racism complaints, but no action was taken.

80.     Subsequently, on December 12, 2020, two white Ten House firefighters laughed loudly and made derogatory and offensive comments about a terrible incident where Black Lives Matter protestors were allegedly run over by a driver in Murray Hill, quipping that the victims should just "walk it off." None of the other firefighters or FDNY personnel present admonished either white firefighter for saying such demeaning and bigoted remarks.

81.     Mr. Holmes had to constantly witness and experience incidents in which white firefighters continuously and callously made racist remarks in front of him and other minority firefighters — the very same white firefighters whom Mr. Holmes was supposed to trust

implicitly while in the line of duty, but who were spouting racist rhetoric incessantly, interfering with Mr. Holmes's ability to effectively do his job.

82.     On December 14, 2020, the FDNY yet again assigned Mr. Holmes to work with Firefighter TD despite his many complaints of discrimination raised against him.

83.     As it was becoming increasingly apparent that the FDNY was not only refusing to take his racism and hostile work environment complaints seriously but was actively trying to undermine and mock his complaints, including by repeatedly partnering Mr. Holmes with his abuser, Firefighter TD, Mr. Holmes was left with no choice but to escalate his concerns.

**IV.     Mr. Holmes Files a Charge of Discrimination Against Defendant with the New York State Division of Human Rights, and is Immediately Retaliated Against by the FDNY, Including Attempts at Intimidating Him by Placing a Rat Figurine Next to the Picture of Him Posted in Ten House**

84.     On December 22, 2020, Mr. Holmes filed a Charge of Discrimination against Defendant with the New York State Division of Human Rights ("DHR").

85.     Prior to then, upon information and belief, after filing his written complaint of discrimination with the FDNY's EEO office, multiple white Ten House firefighters were interviewed as part of its "investigation." Upon information and belief, given the nature of the alleged incidents involving Mr. Holmes that formed the basis of the complaint, and the fact that Mr. Holmes was one of the few and arguably most outspoken Black firefighters at the station, white firefighters against whom Mr. Holmes lodged race discrimination complaints unquestionably knew their source.

86.     To no one's surprise, white firefighters at Ten House started giving Mr. Holmes the "silent treatment." Members even refused to exchange shifts with Mr. Holmes, which was one of many unofficial policies between FDNY firefighters to settle disputes, assign work shifts, and otherwise operate the station. The FDNY's exclusion of Mr. Holmes from being able to

participate in these "unofficial" agreements to swap shifts was retaliatory and resulted in him being subjected to disparate material terms and conditions of employment as compared to other members who were able to continue to benefit from the ability to exchange tours with one another.

87.    Worse, on March 22, 2021, a figurine of a ***rat*** was placed over Mr. Holmes's photograph hung up on Ten House's bulletin board, which was clear retaliation for Mr. Holmes's engagement in protected activity.

88.    Photographs from this incident are reintroduced below:







89.     Upon information, the FDNY has failed to undertake an investigation into this

disturbing and frightening incident, much less discipline those responsible.

90.     Ultimately, on August 25, 2022, the DHR found, following its investigation, that

probable cause existed to support the allegations in Mr. Holmes's Charge of Discrimination and

to believe that the FDNY engaged in or is engaging in the unlawful discriminatory practices

complained of by Mr. Holmes.  As a result, the DHR determined that a formal public hearing on

the matter should be held where the issues can best be resolved by an Administrative Law Judge.

91.    Mr. Holmes merely wanted Ten House to follow EEO policy and not permit

firefighters to engage in divisive political discussions in the workplace or watch television news

programs that promoted racial violence and hatred.  Yet, it was Mr. Holmes who has had to

suffer retaliation for reporting the pervasive anti-Black pattern of rhetoric in the station.

92.    Mr. Holmes became a pariah and outcast merely for speaking out against the

corrosive race discrimination widespread within the FDNY and its ranks.  The harassment of and

animosity towards Mr. Holmes by his FDNY peers and other personnel has continued to the

present and has subjected him to a never-ending hostile and racist work environment.

93.    Mr. Holmes continues to be subjected to derogatory anti-Black comments which

are very offensive and mentally abusive.  Mr. Holmes feels threatened by this incendiary rhetoric

as a Black firefighter, frightened by the openness and freedom with which white FDNY

members speak about the negative feelings towards and resentment of Black people that they

hold.

94.    Having to endure a racially hostile work environment has taken a toll on Mr.

Holmes, who remains in active mental health treatment.  His fear and worry about what his

fellow firefighters and other members of the Department might do to him routinely inhibits his

ability to perform his duties, to the point where Mr. Holmes sometimes considers quitting the

Department altogether.

95.    White Ten House firefighters continue to and have arguably increased their

viewership of Fox News and divisive and incendiary political discussions while at work.  Such

conversations are threatening to Mr. Holmes considering how he is surrounded by FDNY members who take issue with Black people and how they choose to advocate for themselves.

96.     In fact, to avoid having to witness these offensive conversations and/or encounter those white firefighters who have fostered a racially hostile work environment, Mr. Holmes rarely if ever enters Ten House's kitchen.

97.     As a result of the FDNY's unlawful discriminatory and retaliatory practices, Mr. Holmes has suffered and continues to suffer significant economic damages, emotional distress and anguish, humiliation, fear, and harm to his career prospects and reputation.

98.     As a result of the FDNY's unlawful actions towards him, Mr. Holmes has been diagnosed as suffering from depression and anxiety, chronic post-traumatic stress disorder, nightmares, triggers, panic attacks, flashbacks, poor sleep, hypervigilance, irritability, verbal aggression, road rage, depressed mood, anhedonia, isolation, lack of interest, poor sleep, poor concentration, and low energy.  He has also been prescribed medication to cope with his mental health.

## FIRST CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Section 1981)

99.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

100.    By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying him the equal terms and conditions of employment because of his race and subjecting him to a racially hostile work environment.

101.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

102.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

103.    Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

104.    Plaintiff is also entitled to payment of his attorneys' fees and litigation costs from Defendant.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

105.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

106.    By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on his protected activities in violation of Section 1981.

107.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

108.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

109.    Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

110.    Plaintiff is also entitled to payment of his attorneys' fees and litigation costs from Defendant.

### THIRD CAUSE OF ACTION
**(Discrimination and Harassment in Violation of the NYSHRL)**

111.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112.    By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying him the equal terms and conditions of employment because of his race and subjecting him to a racially hostile work environment.

113.    As a direct and proximate result of Defendant;s unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

114.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

115.    Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of NYSHRL)**

116.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

117.    By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on his protected activities in violation of the NYSHRL.

118.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

119.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

120.    Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of NYCHRL)

121.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

122.    By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying him the equal terms and conditions of employment because of his race and subjecting him to a racially hostile work environment.

123.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damage s and other relief, in addition to reasonable attorneys' fees and expenses.

124.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

125.     Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**(Retaliation in Violation of NYCHRL)**

126.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

127.     By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on his protected activities in violation of the NYCHRL, including terminating Plaintiff's employment.

128.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

129.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

130.     Defendant's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.     An injunction and order permanently restraining Defendant and its partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with it, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.     An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.     An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F.     An award of punitive damages;

G.     Pre-judgment interest on all applicable amounts due;

H.     Post-judgment interests on all applicable amounts due;

I.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issue of fact and damages stated herein.

Dated:  March 13, 2023
        New York, New York

                                        Respectfully submitted,

                                        **FILIPPATOS PLLC**

                                        By: _____
                                            Tanvir H. Rahman
                                        199 Main Street, Suite 800
                                        White Plains, New York 10601
                                        T/F: 914.984.1111 (x505)
                                        trahman@filippatoslaw.com

                                        *Attorneys for Plaintiff*